## MARIA L. KINNEY *et al.*

*v.*

## JACOB KNOEBEL *et al.*

1.  JUDGMENT LIEN—*its territorial extent.*  The lien of a judgment upon real estate is only co-extensive with the limits of the county in which it is rendered.

2.  So, where the State recovered a judgment against a party, in the Circuit Court of Sangamon county, the lien of the judgment attached only to the lands of the defendant in that county.

3.  JUDICIAL SALES—*inadequacy of price.* A sale of land under execution will not be set aside for inadequacy of price, unless the inadequacy is gross.

4.  WILLS—*power of executor to sell lands to pay debts—under the provisions of a will.* Where a will empowered the executor to sell all of the testator's lands "outside of St. Clair county," for the payment of his debts, this was an express limitation upon the power of the executor, so far as it was derived under the will, to sell the lands of the testator lying outside of that county.

5.  ADMINISTRATION OF ESTATES—*where the executor has exhausted his power under the will.* Where the power of an executor to sell lands for the payment of debts, is limited by the will to lands situate in certain counties, and the proceeds of sales so permitted prove insufficient to pay the debts, the executor may, no doubt, apply to the proper court and procure an order of sale for so much of the lands reserved from sale in the will, as may be necessary to pay the residue of the debts. In no other way can the executor obtain authority to sell the lands beyond that given by the will.

6.  SAME—*of a sale under execution as a means of subjecting property to the payment of other debts.* Under the statute, no more property should be sold under an execution than shall be required to satisfy it, if the property can be divided. So, neither an executor, nor a creditor, can properly employ a judgment against the testator, as a means of selling real estate beyond the amount of the judgment, and which is susceptible of division, for the purpose of raising money to pay other debts of the estate. The statute has prescribed the mode in which lands may be subjected to the payment of debts, by an executor or administrator, and that mode should be pursued.

7.  PURCHASER *under execution sale—when chargeable with notice of irregularities therein.* Where an executor and an officer improperly employ an execution upon a judgment against a testator, as a means of selling a body of land, exceeding in value the amount of the judgment, and susceptible of division, for the purpose of raising money to pay other debts of the estate, thereby attempting to evade the limitations in the will as to what lands should be sold to pay debts, and also in violation of the law in regard to such sales, and the purchaser under the execution sale participated in the arrangement, he will be held chargeable with notice of the want of power in the executor, and the irregularity of the sale, and subject to all the consequences thereof.

8.  SAME—*redemption, in equity, from such sale—rights of the parties in respect thereto.* But in such case, where the purchaser has acted fairly and without fraud, upon bill in equity by the heirs to redeem from the sale, the redemption will be allowed, and inasmuch as the money advanced by the purchaser, paid and discharged liens of creditors of the estate, he will be subrogated to their rights.

9. In stating the account upon such redemption, the heirs will be required to pay to the purchaser his purchase money, with interest. He will also be allowed the taxes he has paid on the premises, and for lasting and valuable improvements which are not of a merely ornamental character, made before suit brought; he should also be allowed to remove statuary and other ornaments, so far as may be done without permanent injury to the freehold; and he will be chargeable with rents and profits.

APPEAL from the Circuit Court of St. Clair county; the Hon. JOSEPH GILLESPIE, Judge, presiding.

The facts in this case are fully presented in the opinion.

Mr. CHARLES W. THOMAS and Mr. G. A. KŒRNER, for the appellants.

Mr. WILLIAM H. UNDERWOOD, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Appellants filed their bill in chancery, in the St. Clair Circuit Court, against appellees, to set aside a sale of lands made by the sheriff of that county. The bill was subsequently amended by leave of the court. The original and amended bills allege, that Wm. C. Kinney died testate, on the 24th day of October, 1858, seized in fee of the farm on which he resided in St. Clair county, and being section 12, T. 1 N., R. 8 W.; that, by his will, he appointed Jacob Knoebel, executor, who, on the 1st day of November, 1858, accepted and entered upon the trust; that the will empowered him to sell so much of testator's lands, lying outside of St. Clair county, as might be required to pay his debts; that the executor failed to comply with this requirement of the will, as there was an undivided fourth of 5,500 acres of land lying in Pulaski and Alexander counties, which testator owned, and of which he died seized, and that there were debts to a large amount unpaid against the estate.

· It appears, that on the 6th day of May, 1858, Wm. C. Davis recovered a judgment, in the St. Clair Circuit Court, against testator and one Shook and Abend, for the sum of $1,847.50, and the costs of suit; also another judgment, at the same term of the court, against testator, Knoebel and John Galbraith, for the sum of $728.50, and costs of suit; that executions were issued on both of these judgments, and the execution on the last named judgment was, after being placed in the hands of the sheriff, returned unsatisfied, by order of the plaintiff's attorney, and the other was returned levied upon section 12 and other lands, and sold to Abend for $600, without offering it in parcels.

It is alleged, that the judgment had been satisfied before the levy and sale were made, and the property thus sold was worth $60,000, and was offered and sold *en masse;* that testator was only liable for half of the judgment, and that Shook had paid half of the judgment, and that any 80 acres of the section would have sold for enough to have satisfied the judgment; that Abend received a certificate of purchase, and the executor, knowing the facts, made no effort to set it aside.

It is alleged that Davis, in the latter part of 1859, or early part of 1860, assigned to Knoebel the judgment for $728.50, on the record, in order to have section 12 sold to pay the debts of testator, and thus avoid the sale of the lands in Pulaski and Alexander counties; that on the 27th of January, 1859, Knoebel, as assignee of Davis, sued out an *alias* execution on that judgment, and redeemed the section from the sale to Abend; that the sheriff, at the same time, levied upon the section, and, after advertising the same, offered the southeast quarter for sale on the 18th day of February, 1860; that at such sale one Thomas bid the sum of $7,500, but the sheriff refused to accept the bid, although he knew Thomas to be responsible, and who tendered the bid in gold coin; that Knoebel, at the time, promised to pay the judgment, but failed to do so, although he had assets of the estate in his hands sufficient to have paid it; that Meyer, the sheriff, on the 17th

of March, 1860, sold the whole of section 12 to Morrison for $35,000, without offering it in parcels; that the sale was illegal, because the section was susceptible of division, and that any one of the eighty acre tracts it contained would have sold for enough to have paid both judgments; that Morrison knew of all the facts when he purchased.

The bill further charges that Knoebel, Meyer and Morrison conspired to effect the sale to Morrison, who, at and before the sale, prevented competition, by various devices, among which he represented that there was a lien on the land, superior to that of these judgments, for the sum of $12,000, when he knew no such lien existed; that Morrison received a certificate of purchase, and subsequently a sheriff's deed.

Appellants offer to pay Morrison the money he paid, with legal interest.

Defendant Morrison answered the bill and amended bill. The answer alleges, that on the 5th day of August, 1841, The People of the State of Illinois recovered a judgment in the Sangamon Circuit Court against William Kinney, the father of William C. Kinney, for $10,006.61, and costs; that subsequently, and before the month of August, 1845, William Kinney died, and his son, William C. Kinney, became his executor, and, as such, was notified in writing of the existence of the judgment, and that it was unpaid; that on the 19th day of August, 1845, an execution was issued, and on the 22d of September following it was levied by the sheriff of St. Clair county on section 12 and other lands that had belonged to William Kinney in his lifetime, which were held by William C. Kinney, his father having conveyed to him section 12 by a regular deed, for a valuable consideration, made and recorded before the execution was issued and levied; that he claimed the other lands under the will of his father, as sole devisee; that the levy on these lands was recorded in the recorder's office of St. Clair county, on the day the sheriff received the execution; that the writ was returned, and on the 5th of January, 1846, a *venditioni exponas* was issued to the sheriff

of St. Clair county, and the sheriff returned the writ endorsed that he had sold the lands to Thomas Ford, governor, and agent of the people, for the sum of $9,012.

That afterwards, William C. Kinney, as executor of his father, applied to the general assembly, when an act was passed giving him five years to redeem these lands, upon paying the judgment and interest, and upon paying a part thereof a proportionate part of the land should be released to him. In 1851 the legislature extended the time for redemption for one year. In 1853 a like extension of time was given, and again, in 1859, another act was passed, giving his executor two years to redeem.

The answer further alleges, that William C. Kinney was seized of valuable lands in St. Clair, Randolph, Marion, Vermilion. Pulaski and Alexander counties, a large portion of which he held as devisee of his father. Admits that section 12 was among these lands, and that he died seized of it, by a deed of conveyance by his father; that he died, left a will, and that his executor qualified. He further admits the provisions of the will. He alleges that William C. Kinney died bankrupt, owing $40,000, besides the debt to the State of $12,000, which was not pressed against his estate, which would have rendered it wholly insolvent; that Kinney's personal estate was insufficient to pay his debts, and it became necessary to sell section 12 for that purpose; that Kinney, in his lifetime, gave to one Whiteside a bond for a conveyance of thirty acres, a part of section 12, and that Whiteside was in possession at the time Morrison purchased; that Morrison has paid and extinguished Whiteside's claim, and that public roads occupy ten acres of the section.

It is further alleged in the answer, that one Terrell, on the 24th of September, 1857, recovered a judgment, in the St. Clair Circuit Court, against Kinney and Abend, for $167.23; also a judgment, at the same time and in the same court, against Kinney and Knoebel, the latter being security, for $701.50; that executions were issued and levied on the

northwest quarter of section 12, which was sold to Knoebel, who received a sheriff's deed therefor on the 14th of July, 1859; that after Morrison purchased section 12, Knoebel and wife conveyed that quarter to him, for which he paid $1,200. Admits the recovery of the two judgments referred to in the bill; that executions were issued and the sale of section 12 to Abend for $600. That he knew nothing of the sale until afterwards.. Denies that the judgment in favor of the State was a lien; denies that the northwest quarter was susceptible of an advantageous division, and that complainants were prejudiced by that sale. He denies fraud on the part of Knoebel, or that he had assets to redeem from sale to Abend. He alleges that section 12, unincumbered, was worth no more than $25,000. Alleges that on the 27th of January, 1860, execution issued on the judgment against Knoebel, Kinney and Galbraith, by consent of Thomas, who was the assignee, after due notice to the executor; that section 12 was offered under it, in parcels, and when offered in a body Morrison became the purchaser at $35,000, which, with liens, amounted to $36,200.

The answer further alleges, that Morrison paid $80 per acre for 440 left after deducting highways and the 30 acres sold to Whiteside and the quarter to Knoebel, and that the premises were under a lease, for which respondent paid $1,000 to obtain possession. Admits that Thomas bid $7,500 for the southeast quarter of the section, as alleged in the bill, but insists that it was the most valuable. He insists that Knoebel was justifiable in stopping the sale, and denies that either of the Davis judgments was paid before the sale under them, or, if they were, he had no knowledge thereof. He alleges that the estate of Kinney had the benefit of the money paid by him when he purchased. Denies all fraud, or that he prevented competition. He admits that complainants were minors when he purchased, and alleges that their relatives and friends approved of it, and that nearly $18,000 of the purchase money was paid to two of their uncles and to their guardian; that the sale to

respondent was procured by Knoebel under advice of counsel, and with the consent of the creditors; that the sale to him rectified all loss that would have resulted to complainants by reason of the sale to Abend; that he had redeemed from a tax sale, paid taxes, and made $90,000 worth of improvements; that two of the complainants, since coming of age, have received their shares of the surplus money in the hands of the executor, after paying the debts of the estate.

Davis answered, and says he thinks he sold the judgment for $728.50 against Kinney, Knoebel and Galbraith to John Thomas, but does not remember that he assigned it on the record.

Meyer answered, and admits that he was sheriff as alleged, and sold section 12 under the execution as charged; that his deputy conducted the sale, and he was not present; denies all fraud. Admits that he did not strike the land off to Thomas on his bid of $7,500, because attorney for plaintiff in execution forbid him.

Replications were filed, and a hearing was had on bill, answers, exhibits, replications and proofs, when the court rendered a decree dismissing the bill, to reverse which this appeal is prosecuted.

It seems to be conceded by both parties, that testator owned the land, free from any lien of the judgment which the State had recovered in the Sangamon Circuit Court. It is the settled law of this court that the lien of a judgment upon real estate is only co-extensive with the limits of the county in which it is rendered. It, then, follows, in this case, that the judgment only bound the lands of William Kinney in Sangamon county. And testator having purchased of his father, for a valuable consideration, and the deed was recorded, as it is admitted, before the execution was issued and levied, he took free from the lien.

It appears that Morrison, on one or two occasions, spoke to different persons of the judgment held by the people against Kinney, as being a lien upon this land. We, however, think,

that it was satisfactorily shown that Morrison, at the sale, and while the biddings were progressing, stated publicly that this lien was worthless. If it was his object to depress the biddings, it was by his previous statements, and not while the sale was progressing. But in the view we take of the case we regard this question unimportant.

Morrison alleges, in his answer, that one Terrell recovered judgments, one against Kinney and Abend, and the other against Kinney and Knoebel, and executions were issued on the 13th of February, 1858, and the northwest quarter of this section was sold, and Knoebel became the purchaser thereof; that he received a sheriff's deed for the same on the 14th of July, 1859. It appears that Kinney died in the latter part of October, 1858. Morrison alleges that he purchased this quarter of Knoeble, and paid him $1,200 therefor. We find no evidence in the record in reference to this sale from which we can determine what right Morrison acquired, if any, by this purchase, if it was made. When or how this purchase was made does not appear, and we, in the absence of proof, can not say whether Knoebel purchased under such circumstances as gave him title, or only as a trustee, for the use of appellants, and whether Morrison acquired title, or only a trust estate.

As to whether the judgment under which Morrison purchased was satisfied by operation of law, by an assignment to the executor, who was also a co-defendant, the evidence is contradictory and by no means satisfactory. Nor is there any evidence charging Morrison with notice of such assignment, if it was made. In the view, however, that we take of the case it is by no means important to discuss that question.

As to whether the land sold for its full value, as we might reasonably suppose in such case, there was a great contrariety of opinion among well informed persons in the vicinity. Questions of value are always attended with doubt, and can seldom be ascertained with any degree of precision. But a careful examination of all the evidence in the record fails to show that there was a great sacrifice—such an inadequacy

of price as would require the sale to be set aside, if in other respects unobjectionable. At such sales it rarely occurs that property brings such a price as can be obtained at private sale, where there is no redemption, hence courts do not set aside sales for inadequacy of price, unless it is gross.

At the death of testator, the property which he owned in St. Clair county vested in his widow, according to the terms of his will, and his other property vested in his heirs under the statute of descents, subject to the payment of his debts. The fee was in the devisee and the heirs. The will, however, empowered the executor to sell all of his lands "outside of St. Clair county" for the payment of his debts. It will be observed that the power is expressly limited to those lands, and that his power did not extend to those in St. Clair county. As to them he had no authority to intermeddle. Had he sold all of the lands situated in other counties, and they had proved insufficient to pay the debts, he could, no doubt, have applied to the proper court of St. Clair county and procured an order for the sale of all, or so much as would have been necessary, to pay the remainder of the debts. But otherwise he had no power to sell or dispose of that portion of the estate.

It is urged, however, in affirmance of the decree, that the sale under the judgment was valid and passed the title. That this judgment of comparatively a small amount was used to sell property of such large value as a means of subjecting it to the payment of other debts, seems to be beyond doubt. It could not have been the sole object of this transaction to satisfy this judgment, as perhaps any one of the forty acre tracts in the section would have been amply sufficient for the purpose. It appears that the judgment under which the first sale was made was but $600, and that under which the redemption and sale were made was but $728.50, and if interest and costs were added, the whole amount would probably not have exceeded $1,500, and yet property was sold for $35,000. The section was certainly susceptible of division, as, when one quarter of

it was offered, the sum of $7,500 was bid, and the executor, who seems to have controlled the judgment, refused to permit it to be struck off to the bidder. There was an arrangement entered into by the executor and creditors that this sale should be made, and the proceeds applied to the payment of the other debts, and that the creditors agreed with Morrison if he would become the purchaser they would receive cash notes in place of money. It is, therefore, apparent, that this was an effort to do indirectly what the executor and the creditors could not do directly. It was an attempt to use the forms of the law to do what the law had not authorized to be done.

If an executor, or a creditor, with his sanction, may employ a small judgment to sell and dispose of real estate worth many times more than its amount, to pay debts, it may be done to any extent and for any purpose. If such a power is recognized and sanctioned, then all of the lands of which a man dies seized may be sold contrary to even the express provisions of his will, if he is so unfortunate as to die with a small unsatisfied judgment against him. All executors and administrators would thus have the absolute control of the real estate, with power at will to convert it into money. Such a rule would place the rights of heirs and devisees at the mercy of executors and administrators. And if admitted in such cases, guardians could, no doubt, convert the real estate of their wards, at pleasure, into money, if they could but find an unsatisfied judgment, without reference to its size. The common law conferred no such right, nor could the general assembly have contemplated such powers when they rendered real estate liable to execution.

If this was admitted as a rule, any person would be liable to have all of his real estate thus sold, if the sheriff and the creditor should so determine. A testator, in making his will, has the power to confer on, or withhold authority from, his executor to sell his real estate to pay his debts, and failing to give the power, the statute has pointed out the mode in which it may be done. And the statute has also made a judgment of

the circuit court a lien upon real estate of the deceased, and provides the manner in which the lien may be enforced. But it has not declared that more property may be sold than is necessary to pay the judgment; nor has it provided that if there are other debts, enough of property may be sold under an execution on such a judgment to pay all of the debts which deceased owed at the time of his death ; but the statute has declared that no more property shall be sold on execution than shall be required to satisfy it, if the property can be divided. This, then, prohibited this sale, as this property was susceptible of division.

This sale was manifestly against both the letter and spirit of the statute, and is contrary to the common law, so far as relates to the acts of the executor.

We have thus far considered the case in reference to the executor and the sheriff. It remains to determine whether Morrison is to be charged with their misconduct. While we can see nothing in the evidence from which fraud or unfairness on his part can be inferred, still the evidence shows he was a party to the arrangement to sell the property in the mode which was adopted. George Trumbull testified that a meeting of the creditors was held, in which he and Knoebel participated. He says that he advised the executor not to procure an order of court for the sale, but to sell in the mode which was adopted. Shook testifies that he was present at the meeting of the creditors, and was desirous to procure bidders for the farm ; that Morrison was spoken of, and a committee of the creditors saw him to induce him to purchase; that he, at the first interview, did not seem inclined to buy, but took it under advisement. But at the next interview " he said if he could make an arrangement with the creditors for them to take a lot of notes which he had on hand and would indorse, he would become a bidder." It seems the creditors were seen, and the arrangement entered into by them.

By this arrangement Morrison became a party to the sale under the execution, which we have seen the executor and

sheriff had no power to make. He, then, was a purchaser with full notice that this small execution was to be employed to sell property of which it was not more than three per cent. of its value, and thus became a party to the transaction, and, although the property was sold for all it was then worth, he must be held responsible for the want of power to make the sale. Even if the fact that the execution under which the sale was made bore so small a proportion in amount to that for which the sale was made, was not sufficient notice, still this arrangement fully charges him with notice, and he must be charged with the consequences which flow from it. And as the executor had no power to make such a sale for such a purpose, and the officer violated his duty, and Morrison was a party to procuring the sale, he did not acquire such a title as may not be defeated by the heirs, under the bill filed by them in this case for a redemption.

One of the great objects of government is the protection of individuals in the enjoyment of property; and it is a fundamental principle of our government that no person shall be deprived of his property except by the law of the land. It is no where asserted, nor can it be maintained, that a ministerial officer, or a private individual, can deprive another of his property. The law recognizes that power alone under regular judicial proceedings. It is not for the sheriff or the executor or administrator to say that some other mode than that pointed out by the law is less expensive or more beneficial to the owner. They derive all power from the law, and all acts which it fails to sanction are unauthorized and void. Nor is it an answer to say, that the owner's interest sanctions the illegal proceeding, or that, although the act is unauthorized or prohibited by the law, because the property sold for its value, he therefore has no right to complain. It is not a question whether the owner has suffered loss, but it is a question of power to perform the act, and thus transfer the title from the owner to another. Nor is it a question of good or evil intention, or of fraud or good faith in those performing the act. A

ministerial officer, or others acting in that capacity, to have their acts sustained, must show legal authority.

A person purchasing at a sale void for the want of authority, is chargeable with notice of the want of power. If a sheriff were to sell lands without a judgment and execution, the sale would be void, no matter what the price paid by the purchaser; nor could he claim that he acted in good faith, as he is bound to know that there is a judgment and execution. And when the purpose and object is to sell a vast amount of property under an execution for a small sum, and the purchaser is privy to the arrangement, and knows the law prohibiting such sales is being violated, the rule should be the same as though there was no execution. In the one case the officer acts without power, and in the other he exceeds his power; and the acts *ultra vires* are equally void as acts performed *sine vires*. The executor, in this case, in having this entire section sold, acted without authority to pass the title, as neither the law nor the will conferred it, and the sheriff exceeded his authority. It then follows, that as Morrison had notice, this sale was unauthorized, and the purchaser, being not only charged with notice, but having participated with the executor and creditors to bring about the arrangement, and to become the purchaser, acquired no absolute legal title, but the form only of such a title.

It is urged, that this transaction had the approval of the relatives and friends of appellants, and this seems to be true. But while this may tend to prove that they may have thought that it was for the benefit of appellants, and that Morrison was not endeavoring to obtain any undue advantage in his effort to purchase, it most assuredly could not confer power to perform an act not authorized by law. There is no principle in our law which confers power upon the relatives or friends of another to sell and dispose of his property, or to authorize it to be done by others. This is a power that has never been sanctioned, and to permit it would destroy the exclusive dominion over property which ownership has always conferred,

and which has ever been protected. Nor can hardship legalize an act unauthorized by law. Every person is supposed to know the law and to act in reference to its provisions; and when his acts are outside of the law he must suffer the inconveniences they have produced.

Notwithstanding the sale was unauthorized, Morrison has advanced money which has paid and discharged liens of creditors to a large amount on the property; and inasmuch as he acted fairly and without fraud in his purchase, it is manifestly equitable that he should be subrogated to the rights of the creditors whose debts his money has paid; especially so, as complainants are asking the aid of the court by permitting them to redeem. This is but equitable and just. As the purchase money Morrison paid at the sheriff's sale relieved the estate of Kinney from all its indebtedness, and gave a surplus to the executor for the benefit of the heirs, we are of the opinion that, as a condition to their redeeming these lands, appellants should pay him the purchase money with interest. He should also be allowed for all taxes he has paid on the premises, and for all lasting and valuable improvements, which are not of a merely ornamental character, made before this suit was brought; and he should be charged with rents and profits received from the place. He should also be allowed to remove statuary and other ornamental expenditures, so far as may be done without permanent injury to the freehold.

In reference to the thirty acres sold by Kinney, in his lifetime, to Whiteside, and which Morrison subsequently purchased of him, as is alleged in his answer, we are not able, from the facts in the record, to say whether Morrison is entitled to hold it, or whether he received a credit for the amount paid to Whiteside to extinguish the bond, on his bid at the sheriff's sale. That will be determined by the court below on another trial, and the equities of the parties settled in reference to that thirty acres.

There are not facts in this record from which we can determine whether Morrison is the owner, under Knoeble, of the quarter which he swears he purchased under execution against Kinney, in his lifetime. We only hold that the title which Morrison acquired under the execution sale which we have been considering, can be redeemed by appellants.

It is the opinion of the majority of the court that the decree of the court below should be reversed and the cause remanded, for further proceedings not inconsistent with this opinion.

*Decree reversed.*