---

Mᴀʀɪᴀ L. Sᴍɪᴛʜ *et al.* *v.* Jᴀᴄᴏʙ Kɴœʙᴇʟ *et al.*

and

Jᴀᴍᴇs L. D. Mᴏʀʀɪsᴏɴ *v.* Mᴀʀɪᴀ L. Sᴍɪᴛʜ *et al.*

1. Mᴏʀᴛɢᴀɢᴇᴇ—*when title held only as security, will so continue when conveyed to another who has notice.* When land is sold on execution, and bought in by the debtor in the name of another, who pays the money and takes the certificate of purchase to himself to secure the repayment, and the owner dies without redeeming, and the holder of the certificate becomes his executor, and takes out a deed to himself upon his certificate, but only claims to hold it as security for the money advanced by him, a purchaser from him, with notice of the fact, will hold only as a mortgagee, and the land may be redeemed from him.

2. Rᴇᴅᴇᴍᴘᴛɪᴏɴ—*when allowed, and from what.* Where an executor, for the purpose of raising money to pay debts of the estate, causes a sale to be made under an execution against his testator of more land than is neces-

sary to satisfy the execution, and, as a part of the transaction, agrees to convey to the purchaser a portion of the land, the legal title of which is in him, though, in fact, held only as security, upon the payment of the amount due him the heirs or devisees of the testator will be permitted to redeem from such sale by paying the whole amount paid by the purchaser, and he will not be permitted to insist on the legal title acquired by the deed from the executor, but the whole will be treated as one transaction, and a redemption allowed by the payment of all the money he has paid out upon the land, both at the original sale and to remove incumbrances.

3. SAME—*upon what terms allowed, from irregular sale by executor.* Where the purchase money at a sale of land made by an executor pays all the debts of the estate, and leaves a surplus for the heirs, although the sale was irregular a court will require the heirs, upon a bill filed to set it aside, to refund all the money paid by the purchaser at such sale, with interest, and also to repay all taxes paid by him, and pay for all lasting and valuable improvements made before the bill was filed, he being charged with rents and profits.

4. SAME—*equities of parties classified.* Where lands have been sold under such circumstances that a court will permit a redemption, and it appears that there have been large sums spent by the purchaser in improving and ornamenting the premises, some of which improvements are valuable and some only ornamental and matters of taste, the purchaser's right to have the purchase money refunded is the highest equity, the second in degree is the right of the heirs to receive the value of the property, exclusive of the improvements, over and above the amount of purchase money, and the lowest equity is the right of the purchaser to be reimbursed for the improvements made by him.

5. SAME—*interest, and rents and profits.* Where a bill to redeem land is filed, and the party in possession refuses to accept redemption money, he will not, when the case is heard, be permitted to say that the rents and profits after the filing of the bill were less than the interest on the redemption money, and claim the excess, but, from and after the filing of the bill, the rents and profits will be treated as equivalent to the interest on the redemption money.

APPEAL from the Circuit Court of St. Clair county.

Mr. CHARLES W. THOMAS, and Mr. G. A. KŒRNER, for the appellants, the heirs of William C. Kinney.

Mr. W. H. UNDERWOOD, for the appellee J. L. D. Morrison.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

The proceedings brought before this court by these two appeals were begun in the circuit court of St. Clair county on

the 18th day of July, 1866, by a bill in chancery, filed by Maria L. Kinney, Mary F. Kinney, and Elizabeth K. Kinney, complainants, against James L. D. Morrison, Jacob Knœbel, Frederick Meyer, Edward Abend, and Wm. C. Davis.

By their original bill, complainants sought a decree setting aside a certain sale, made on the 11th of March, 1860, by Meyer, as sheriff of St. Clair county, of 640 acres of land in that county, known as sec. 12, town. 1 north, of range 8 west, upon an execution in which Davis was plaintiff. At this sale the land in question was bought by Morrison. Complainants were, at the time of the sale, minors, and were the only heirs at law of Wm. C. Kinney, deceased. The land was sold as a part of the estate of deceased. Issues were formed, proofs taken, and the suit was first heard in the circuit court in October, 1867.

The circuit court, at that hearing, dismissed the bill, and complainants appealed to this court, and the case was decided here at the June term, 1868. It is reported in 51 Ill. 112, under the title of *Kinney et al.* v. *Knœbel et al.* To that report of the case reference is made for a full statement of the then condition of the record, and the grounds upon which the judgment of the court was placed. It was then decided, in substance, that what purported to be a sheriff's sale to Morrison, could not be sustained, but must be set aside upon terms. The decree was reversed, and the cause remanded for an account to be taken of rents and profits, taxes and improvements, and for further investigation of Morrison's claim, under what was called the Whitesides bond, and under what was known as the Knœbel deed.

After the suit was reinstated in the circuit court, amendments were made to the bill and to Morrison's answer. Maria L. Kinney had intermarried with George W. Smith, and Mary F. Kinney had intermarried with Gustavus A. Kœrner, and the respective husbands of these parties were made parties. Additional proofs were taken, and the suit was brought again to a hearing on the merits, November 23, 1871.

The circuit court found the thirty acres claimed by Morrison under the Whitesides bond to be the property of the origi-

nal complainants, held in fee by them, unaffected by the sheriff's sale to Morrison, and the north-west quarter of the section to be the property of Morrison, held in fee, by virtue of the deed to him by Knœbel and wife, and that his title to the same was not to be affected by the setting aside of or the redeeming from the sheriff's sale to Morrison, and a decree was entered that the complainants might redeem the residue of the section, by the payment of $95,369.69 to Morrison, within a time fixed by the decree, and in default thereof that they should be forever barred of all claim to that part of the land. From this decree both complainants and defendants have appealed to this court.

This decree of the circuit court can not be sustained. The proof relating to the claim of Morrison, founded upon the bond to Whitesides, is meagre, and far from sufficient to establish any title in Morrison. Palpably it was not regarded by Whitesides or any one else as such an equity as gave him absolute right to this thirty acres of land in fee. Thirty acres of this land could not have been worth less than $1600, yet Whitesides relinquished his claim upon it for $400. Morrison, so far from claiming title thereunder, at first seems to have regarded it as a mere incumbrance upon a part of the estate, and to have thought, by the conditions of his purchase, that he should not be required to pay for its extinguishment. He presented a claim therefor against the estate of Kinney, in his settlement with the executor, and it was then allowed, and he received credit for the amount he thus paid Whitesides.

The circuit court was right in refusing to sustain Morrison's claim under this Whitesides bond, but it is not perceived upon what ground it can be held that the complainants thereby acquired any title to this thirty acres, other than that they inherited from their father, or which should place their claim to that tract on any basis differing from the basis upon which their claim to other parts of the section rests. Morrison's purchase at the public sale was of the whole section. If that sale be set aside, and the title he professed to buy be restored to the heirs, they should refund any money he may have advanced to preserve their title. They thereby acquire no inde-

pendent title, nor any title not subject to the equities which pertain to the whole subject matter of the sale.

The decree is equally erroneous in holding that Morrison acquired an independent and valid fee simple title, by his deed from Knœbel, for the north-west quarter of the section. At the time of the sheriff's sale of this entire section, at which Morrison became a purchaser, Knœbel had a claim against the north-west quarter of this section, evidenced by a sheriff's deed made to him on the 14th day of July. 1859. This deed was founded upon a sheriff's sale, made to Knœbel February 13, 1858. At that time the property was struck off to him at $928.12, and a certificate of purchase issued to him. That sale to Knœbel was made by the sheriff by virtue of two executions, issued upon judgments rendered at the September term, 1857, each in favor of one Terrill, one for the sum of $167 and costs, against Kinney and Abend, and the other for the sum of $701.50 and costs, against Kinney and Knœbel.

As to the character of that claim, Knœbel testifies that before the sale on these executions, Terrill's agent threatened to levy on his (Knœbel's) land, to satisfy one of these judgments, which had been entered against Kinney and Knœbel, and was founded upon a note of Kinney, signed by Knœbel as security. Knœbel reported this threat to Kinney. Kinney told Knœbel, that "sooner than that Knœbel should lose one cent by him, he would sacrifice everything he (Kinney) had." He said "he would see the sheriff, and get him to levy upon some of his (Kinney's) own land; that he had not then the money. and Knœbel would have to advance the same." Kinney did see the sheriff, and induced him to levy upon the north-west quarter of this section 12, and when the sale occurred (Knœbel not being present). Kinney bid in the land in Knœbel's name, at $928.12, and immediately reported to Knœbel what he had done. and Knœbel advanced to Kinney the money to pay the bid. and a certificate of purchase was issued in Knœbel's name, and given to him.

This land. at that time, was worth from $8000 to $10.000. Knœbel and Kinney were evidently intimate friends. Kinney,

before that time, had made his will, and in it had named Knœbel as his executor. It can hardly be doubted that both Kinney and Knœbel regarded this whole proceeding merely as a means of securing to Knœbel the repayment of the money so advanced by him, with interest and costs, growing out of the transaction, nor did Knœbel ever treat this as anything more than such a security.

Some weeks before the sale to Morrison, and after Knœbel had received his sheriff's deed for this quarter section, Knœbel called a meeting of the creditors at Trumbull's office, and laid before them the then condition of the estate.

Trumbull, in his testimony as to what transpired at this meeting, says: "The greater portion in value of the real estate consisted of what was known as the Kinney farm (this section 12). This had been sold some ten or twelve years ago by the State, on a judgment against Wm. Kinney. * * *. One of the tracts of the Kinney farm had an incumbrance of $1200 or thereabouts."

This, evidently, has reference to the Knœbel claim, and shows that, in laying before the creditors the affairs of the estate, he claimed only a lien on this quarter for some $1200.

In his answer, filed October, 1869, Knœbel admits that Wm. C. Kinney died seized of this entire section of land, as stated in the bill, clouded, however, by the claim of the State of Illinois, and incumbered as set forth in Morrison's answer; and a reference to Morrison's answer shows that Morrison sets out what is called the State claim, the Whitesides bond, and the sheriff's sale of this north-west quarter of the section to Knœbel. The bill had charged Knœbel, among other things, with having fraudulently neglected to have redemption made from this sheriff's sale to himself. It was also charged that the subsequent taking by him of a sheriff's deed, under that sale, was fraudulent and void. Answering this charge, Knœbel, in his answer, says, that what he had done he "did solely for the benefit of said estate." And he further says, that "all and everything he did in relation to said lands (meaning all the section), was done by him through the advice of counsel, and

that all and every act of this defendant (Knœbel)    *    *    *
were in the utmost good faith, and solely for the purpose of
saving said Kinney's estate—that all the creditors might be
paid, and save all that could be saved for the benefit of heirs."
In another part of his answer he says, that "although not le-
gally bound so to do, he treated his acts and liens as in trust
for said estate, and so accounted and finally settled said estate."

In his deposition, given in 1867, Knœbel, speaking of his
purchase at sheriff's sale of this north-west quarter, swears:
" I purchased in the quarter section to secure myself, and had
received a sheriff's deed therefor."

It is plain that this certificate of purchase for this quarter
was originally received by Knœbel merely as a security, and
not as a purchase. The sheriff's deed, taken by him after
Kinney's death, was surely taken merely to carry out in good
faith the original design.

An executor is not bound to advance his private funds for
the benefit of the estate, but the proof shows that Knœbel did,
in divers ways, advance his money to save the property of the
estate from sacrifice, and took great interest in its preservation.
This land was worth at least $8000. It had been bid in at
$928. Had this certificate of purchase been held by a stran-
ger, it can hardly be supposed that Knœbel would not have
found means to redeem from this sale, or that he would ever
have permitted a sheriff's deed to be made to the stranger.
We are convinced, when he accepted this sheriff's deed, he
had no thought of appropriating that land to himself, but re-
ceived it in furtherance of the design with which the land was
bid in, merely as a security.

We must conclude, then, that at the time of the sale to Mor-
rison, this title or claim of Knœbel was not an absolute and
indefeasible title as against Kinney's heirs or creditors, but
was in the nature of a mortgage for advances, and was subject
to redemption. Knœbel held as against the heirs the form of
a legal title, but in substance a mere equitable lien, upon the
north-west quarter of this section 12—not an indefeasible title.

He held the land merely as security, subject to redemption by the heirs.

Did Morrison, by the quitclaim deed from Knœbel and his wife, acquire any greater or higher title to this quarter? We think not.    Morrison had actual notice that Knœbel held merely a lien.    This is shown by the proof that it was generally so understood among the bystanders at the sale.

Trumbull testifies that he was present at the sheriff's sale to Morrison.   He says: "It was struck off, I think, at $35.000, and the purchaser took it subject to an incumbrance on one tract of $1000 or $1200, which the purchaser was to pay."   He adds, that he can not remember whether it was mentioned by Challenor, who cried the sale, or by Knœbel, but thinks one of them spoke of it.

Mr. Stookey, who was present at the sale, says, he understood there was an incumbrance of $1000 which the purchaser was bound to pay, making the purchase money $36,000.

On cross-examination, he was asked whether anything was said at the sale about prior incumbrances, and he answered, "My impression is, the State claim was mentioned, and $1000 which was going to Knœbel, which the purchaser would have to pay."

Thomas, who attended the sale, and bid, testifies, that he understood that the north-west quarter of the section, 12, had been sold under some execution.   "I understood the redemption on this would be about $1200, and that this redemption would have to be made by the purchaser."

It seems to have been known to the bystanders and bidders, and must have been known to Morrison, that Knœbel did not claim anything in this land higher than a lien or incumbrance for $1200, and Morrison can not, therefore, resist the equitable right of the heirs to claim redemption from that lien, any more than Knœbel, himself, could resist their right had he made no conveyance.

Whatever may have been the original nature and extent of Knœbel's title to this land, Morrison can not properly claim (under his deed from Knœbel, and as against the heirs of Kin-

ney,) to hold rights arising from a purchase from Knœbel separate and distinct from his purchase of the whole section at this so called sheriff's sale.

This sale has been decided by this court to have been a sheriff's sale only in form. In fact, it was a mere device by the executor to convert the property of these minor heirs into money to pay the debts of the estate, and for the supposed benefit of these heirs. The sale of Knœbel's claim to the north-west quarter of the section was part and parcel of the same transaction, and this deed of Knœbel was part of the machinery for the same purpose. If Knœbel had held an absolute fee simple title to the north-west quarter, and had chosen, for the purpose of facilitating the sale of the whole section, to have contributed that title (less $1200) to the property sold, it would nevertheless have been part and parcel of the principal sale, under the circumstances. That sale being set aside, the sale of the Knœbel interest falls as part of the whole. That this view is correct. we need only look into the pleadings and evidence to ascertain.

Morrison, in his answer filed November, 1867, says, that this whole section, etc., was sold to this respondent, under said execution, at said sale, for $35,000, subject to Jacob Knœbel's title to a part thereof, which he offered to release to the purchaser for $1200 in money, to him to be paid. Defendant actually paid $36,200 for said land, of which sum he paid Jacob Knœbel $1200 for his release deed to the north-west quarter of section 12, and $35,000 more under the sale on execution aforesaid," * * And this defendant further alleges, that said Jacob Knœbel, in pursuance of his promise, conveyed to this defendant, in consideration of $1200, said north-west quarter of section 12, and defendant further says that, after said sale, "he paid the $35,000," etc.

This purchase of the Knœbel claim on this quarter section, is thus shown, by Morrison's own answer, to have been part and parcel of the principal sale made by Knœbel, in the form of a sheriff's sale. Again, Knœbel testifies, in July, 1867, " I promised, at the sale to Morrison, to quitclaim for my out-

lay, which I did." Again, when called by Morrison as a witness before the master, October, 1869, he testified: "I stated at the sheriff's sale when Morrison bought the land, that I would make a deed for the said north-west quarter to any body who would pay a good price for the land and pay me $1200." He further says he thought the land was his, but he gave it up for the benefit of the estate.

The entire transaction of March 17, 1860, was, in substance, a sale of the Kinney farm by Knœbel, the executor, to Morrison, the purchaser, at the price of $36,200. The sheriff's sale and the Knœbel deed were but parts of the instrumentalities by which the end was to be accomplished. $1200 of the purchase money was to go to Knœbel for his lien under his sheriff's deed; about $1500 was to go to the satisfaction of the Davis judgment, and to the refunding the money paid to redeem from the Abend purchase, and the residue of the $36,200 was to go into the hands of the executor as a fund with which to pay the debts of the estate, the surplus, if any, to be paid to the guardians of the minor heirs. The purchaser was to take the risk of what was called the State lien. The whole transaction was one, and all its parts rest upon the same basis, and must stand or fall together.

This court, upon the former appeal, decided that the title which Morrison acquired under the so-called sheriff's sale of March 17, 1860, was subject to redemption by the heirs of Kinney. We find no additional facts in this record tending to disturb that decision. As between these parties, we regard that question as *res adjudicata.*

We will now consider the mode and the terms upon which the equities of these parties should be disposed of.

This question is not free from difficulty. Had the property remained *in statu quo*, the solution might not be difficult. It is, however, shown, that Morrison has made valuable, extensive, and very expensive improvements. Some of these improvements, "though not of a merely ornamental character," are not necessary improvements, or even improvements appropriate to rendering the property profitable and useful. Many

26—82D ILL.

of these improvements are such as ordinary owners of land can not afford to make or buy. While they are useful, they are, nevertheless, purely matters of luxury, and appear to be a part of the realty. and some of them of such nature that it is difficult to say what is useful and what is merely ornamental.

· This court, in 51 Ill. 126, said, that as the purchase money Morrison paid relieved the estate of Kinney from all its indebtedness, and gave a surplus to the executor, for the benefit of the heirs, we are of opinion that, as a condition precedent . to their redeeming these lands, the heirs should pay him the purchase money, with interest. It was further said, that he should be charged with rents and profits, and allowed for taxes and for lasting and valuable improvements, made before the suit was brought, and which were not of a merely ornamental character.

This language, it seems, was not intended to conclude the question as to the terms of the redemption. for afterwards it is said: "We only hold that the title which Morrison acquired * * * can be redeemed from, by appellants."

In the view we take of the case upon the record now presented, the purchase money was, in fact, $36,200, consisting of the $35.000 bid in form, and of the $1200 paid to Knœbel, to relieve the property bid for from his lien. The $400 afterwards paid to Whitesides, was refunded to Morrison by the executor, hence no further notice need be taken of that transaction.

The amount we have to deal with as the purchase money, is $36.200. The interest upon this amount from the day of sale (March 17, 1860,) to the day of filing the original bill, (July 18, 1866,) at six per cent per annum, amounts to $13,762, making, principal and interest, the sum of $49.962. From this must be deducted the net profits derived by Morrison from the use of the land.

From the proofs and the master's report it appears that ·the net value of the use of the land, from the time Morrison took possession until the suit was brought, (after paying taxes and for clearing part of the land, and necessary incidental expenses,)

was about the sum of four thousand nine hundred and fifty-six dollars ($4956.) If this estimate ·be correct, and had none but necessary and economical improvements been made, the sum of forty-five thousand and six dollars ($45,006) would have been the amount of redemption money necessary to be paid by the heirs at the bringing of suit, to effect a complete redemption of this whole property.

. It seems, from the master's report, that the net value of the use of all this land has been less during the pendency of the suit than the amount of interest accruing upon the purchase money for the same time. Inasmuch, however, as Morrison has denied the right of the heirs to make redemption, has refused to accept redemption, and has retained possession against the will of the heirs, without any offer on his part to do equity, we think that he can not be allowed to allege that he has been losing money by so doing, and on that account to demand a larger amount on account of his purchase money than he had right to demand when the suit was begun. He can not justly complain, under these circumstances, if this part of the account be adjusted by holding the use of the property a just equivalent for the use of the purchase money, and we think it should be so adjusted. We, therefore, find that $45,000 is the amount to which Morrison is entitled in equity on account of his purchase.

The proofs, however, show that Morrison, before the beginning of suit, had actually made large and expensive improvements, variously estimated at from $50,000 to $90,000, and that the value of the entire property has been largely enhanced thereby.

Weighing all the evidence bearing upon the subject, we are inclined to the conclusion that the whole property is worth (and would probably sell for) some $40,000 to $50,000 more with these improvements than it would without them.

After weighing the proofs in the record, we are brought to the conclusion that the land, with all its improvements, is worth about $120,000; that the land alone, excluding improvements, is worth about $75,000; that the redemption money

which the heirs should pay to Morrison, on account of purchase money, amounts to about $45,000.

It follows, that the equity of the heirs of Kinney, in this property, amounts to about $30,000, while that of Morrison amounts to about $90,000. The difficulty presented relates to the manner of separating these equities and giving to each his own, without doing injustice to the other. The highest equity in the case is the equitable right of Morrison to have his purchase money refunded. The equity next in rank is the right of the heirs to have their land restored to them, upon the refunding of this purchase money. The lowest equity in rank is the claim of Morrison to payment for his improvements. In truth, the propriety of making to him an allowance for these improvements does not rest upon any right of Morrison to demand the same, but upon the ground that good conscience in the heirs must forbid them from voluntarily taking to themselves any benefit produced to them by another, without making proper compensation. If, however, that benefit, without their consent, be combined with that to which they have a just right, in such manner that it is impossible for them to appropriate their own without appropriating the same, and the supposed benefit is such that they do not need it, do not wish to buy it, and, in fact, are unable to buy it, in such case they ought not thereby to be excluded from taking that which is their own.

The solution of the question is, however, rendered less difficult in this case, from the fact that Kinney's heirs have signified their willingness to accept a reasonable pecuniary compensation for their equity, instead of insisting upon the possession of the land itself. In that way, these equities may all possibly be preserved.

This is a case resting upon its own peculiar facts, and we have concluded to make such order as seems to us to make the nearest approach practicable to preserving all these equities, and to be the least likely to work serious wrong to any of the parties.

The decree of the circuit court in this case is, therefore, re-

versed, and the cause remanded, with directions to the circuit court that a decree be entered, declaring the legal title to the whole of said land (that is, said section 12.) to be in Morrison, but held by him in trust for the parties having equitable interests therein; and finding that Morrison has a first equity therein (on account of purchase money paid therefor as above stated), which equity is of the value and amount of $45,000; and also finding that the heirs of Kinney (the original complainants) have an equity in said premises, on account of the excess of the present value of said land, not embracing improvements made by Morrison, over the amount of the sum allowed Morrison on account of purchase money, and that the value and amount of this equitable interest of the said heirs of Kinney is now at least $30,000; and finding that said Morrison has also an equity in said premises, subordinate to the two preceding equities, growing out of the enhancement of the value of the whole premises, by reason of improvements made thereon by Morrison, and that this subordinate equity of said Morrison is now of the value of $45,000.   And said decree shall order and adjudge that the said heirs of Kinney may redeem from Morrison the whole of said premises, embracing all improvements thereon attached to the land as part of the realty, whether the same be useful or merely ornamental, by paying to him, within three months from and after the date of the decree, the sum of $90,000; and that, if this redemption be not made by the said heirs within the said period of three months, then the defendant, Morrison, may, at any time within the three months next succeeding the period allowed for redemption by the said heirs, redeem the whole of said premises, embracing all improvements, from all the equitable claims thereto of the said heirs of Kinney, by paying to them within that time the sum of $30,000; and it shall be decreed that Morrison pay the costs of this suit up to the time of the making of said decree.

The decree shall further provide, that in the event that neither of the redemptions aforesaid be made, the whole of said premises, embracing all improvements thereon which are part of the

realty, shall be sold, providing for the application and distribution of the net proceeds of such sale, after paying the costs of such sale, to be made in such manner as to give, first, to said Morrison the sum of $45,000; and next, to the said heirs of Kinney (original complainants) the sum of $30,000; and next, to said Morrison the sum of $45,000; and that the excess, if any, above the sum of $120,000 shall be divided and distributed so as to give to said Morrison three-fourths thereof, and to the said heirs of Kinney one-fourth thereof.

The distribution of the proceeds of such sale is to be made. as of the day of such sale, so that each party shall share in the interest which may arise from the deferred payments of any part of the amount bid by the purchaser at such sale, according and in proportion to his, her or their share in that portion of the purchase money from which such interest may accrue.

The decree must also provide that such sale be made upon the premises, upon notice of at least sixty days, and that the terms of such sale shall be, that the purchaser or purchasers shall pay, in cash down, one-fourth of the amount of the purchase money, and the balance in three equal annual installments, with interest on the unpaid part at the rate of six per cent per annum, to be secured by the promissory notes of the purchaser or purchasers, with mortgage upon the property bought.

The decree should require any redemption or sale of the premises, or the sale of any part thereof, before becoming final, to be reported to the court and to be approved by the court. The circuit court will retain and, from time to time, continue the suit, until the ends of the decree are accomplished, and, at proper times, should put the proper parties in possession, and require, at apt times, of the proper parties, suitable releases, conveyances and acquittances to accomplish the objects of the decree.

*Decree reversed.*

Mr. Justice Walker:

If it be conceded that the rule adopted in settling the equities of the parties in this case is correct, still the value, I

think, which has been placed on the farm is too high. There has elapsed a long time since the evidence was taken, and I have no doubt that there has been a large depreciation in the value of this, as well as all other property of a similar character. There is evidence in the record that fixed its value higher, but there is also evidence fixing it much lower, and, from the length of time since the evidence was heard, it seems to me to be unsafe to act on it to fix the value of the farm. Under the rule adopted, I think the case should be remanded to take proof on that question, and thus fix the rights of the parties with more certainty.

Mr. JUSTICE BREESE:

I do not concur in all the views presented by this opinion. In my examination of the record, I have failed to find any evidence on which to base the equities of appellants as they are adjudged in this opinion. There is no proof on the point, and the question was not raised or discussed in the argument. The findings of the circuit court were had upon the remandment of the cause by this court, as reported in 51 Ill. 112. In that case this court said, " Notwithstanding the sale was unauthorized, Morrison has advanced money, which has paid and discharged liens of creditors, to a large amount, on the property; and, inasmuch as he acted fairly and without fraud in his purchase, it is manifestly equitable that he should be subrogated to the rights of the creditors whose debts his money has paid, especially so, as the complainants are asking the aid of the court by permitting them to redeem. This is but equitable and just. As the purchase money Morrison paid at the sheriff's sale relieved the estate of Kinney from all its indebtedness, and gave a surplus to the executor for the benefit of the heirs, we are of opinion that, as a condition to their redeeming these lands, appellants should pay him the purchase money with interest. He should also be allowed for all taxes he has paid on the premises, and for all lasting and valuable improvements, which are not of a merely ornamental character, made before the suit was brought; and he should be

charged with rents and profits received from the place. He should also be allowed to remove statuary and other ornamental expenditures, so far as may be done without permanent injury to the freehold."

With these directions, the cause was remanded, and I do not understand that any evidence has been since taken on which the equities, as declared in the opinion, could possibly be based. Every decree should have sufficient evidence to support it. Here, there is none, and the equities of appellants seem to be merely speculative. I concur with Mr. Justice WALKER, since the evidence was taken, some five years since, there may have been a large depreciation in the cash value of this land. In my judgment, the equities of appellants should not be adjusted as they have been, as, it seems to me, they have been so adjusted in the absence of evidence.